IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

EDDIE LEE FOSTER, #143404,     )
      )
     Plaintiff,     )
      )
     v.     )     CIVIL ACTION NO. 2:13-CV-420-WHA
      )         (WO)
      )
WARDEN KENNETH JONES, et al.,     )
      )
     Defendants.     )

## RECOMMENDATION OF THE MAGISTRATE JUDGE

## I. INTRODUCTION

In this 42 U.S.C. § 1983 action, Eddie Lee Foster ("Foster), a state inmate, alleges that correctional officials violated his constitutional rights by allowing his exposure to unreasonable levels of environmental tobacco smoke ("ETS") during a prior stint of incarceration at the Bullock Correctional Facility ("Bullock").[1]  Specifically, Foster contends that the defendants acted with deliberate indifference to his health by allowing inmates to smoke in the dorms at Bullock.  Foster names Warden Kenneth Jones and Assistant Warden Sandra Giles, correctional officials employed at Bullock when the actions about which he complains occurred, as defendants in this cause of action.  Foster seeks a declaratory judgment, injunctive relief and monetary damages for the alleged violations of his constitutional rights.

---

[1] The claims presented in the complaint relate to actions which occurred from June 14, 2011 until the filing of the complaint.  *Order of July 3, 2013 - Doc. No. 7.*  Foster was transferred from Bullock on December 19, 2014 and is now incarcerated at the Hamilton Aged and Infirmed Facility.

The defendants filed a special report, supplemental special reports and supporting evidentiary materials addressing in response to the complaint.  Pursuant to the orders entered in this case, the court deems it appropriate to construe these reports as a motion for summary judgment.  *Order of August 27, 2013 - Doc. No. 20*.  Upon consideration of this motion, the evidentiary materials filed in support thereof and the plaintiff's responses in opposition to the motion, the court concludes that the defendants' motion for summary judgment is due to be granted.

## II.  SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam) (citation to former rule omitted); Fed.R.Civ.P. Rule 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").[2]  The party moving for summary judgment "always bears the initial responsibility of informing

---

[2] Effective December 1, 2010, Rule 56 was "revised to improve the procedures for presenting and deciding summary-judgment motions."  Fed.R.Civ.P. 56 Advisory Committee Notes.  Under this revision, "[s]ubdivision (a) carries forward the summary-judgment standard expressed in former subdivision (c), changing only one word -- genuine 'issue' becomes genuine 'dispute.'  'Dispute' better reflects the focus of a summary-judgment determination."  *Id.*  "'Shall' is also restored to express the direction to grant summary judgment."  *Id.*  Despite these stylistic changes, the substance of Rule 56 remains the same and, therefore, all cases citing prior versions of the rule remain equally applicable to the current rule.

the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine issue [- now dispute -] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995) (moving party has initial burden of showing there is no genuine dispute of material fact for trial). The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present appropriate evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-324.

The defendants assert that they have met their evidentiary burden and demonstrated the absence of any genuine dispute of material fact with respect to the claims presented by the plaintiff. The burden therefore shifts to the plaintiff to establish, with appropriate evidence beyond the pleadings, that a genuine dispute material to his case exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at 324; Fed.R.Civ.P. 56(e)(3) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact by [citing to materials in the record including affidavits, relevant documents or other materials] the court may ... grant summary judgment if the motion and supporting materials -- including the facts considered undisputed -- show that the movant is entitled to it."); *Jeffery*, 64 F.3d at 593-594 (internal quotation marks omitted) (Once the moving party meets its burden, "the non-moving party must then go beyond the pleadings, and by its own affidavits [or statements made under

penalty of perjury], or by depositions, answers to interrogatories, and admissions on file," demonstrate that there is a genuine dispute of material fact.). This court will also consider "specific facts" pled in a plaintiff's sworn complaint when considering his opposition to summary judgment. *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014). A genuine dispute of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor. *Greenberg*, 498 F.3d at 1263; *Allen v. Bd. of Public Education for Bibb County*, 495 F.3d 1306, 1313 (11th Cir. 2007).

To proceed beyond the summary judgment stage, an inmate-plaintiff is required to produce "sufficient [favorable] evidence" which would be admissible at trial supporting his claims of constitutional violations. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); Rule 56(e), *Federal Rules of Civil Procedure*. "If the evidence [on which the nonmoving party relies] is merely colorable ... or is not significantly probative ... summary judgment may be granted." *Anderson*, 477 U.S. at 249-250. "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986)." *Walker v. Darby*, 911 F.2d 1573, 1576-1577 (11th Cir. 1990). Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine dispute of material fact and, therefore, do not suffice to oppose a motion for summary judgment. *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (A plaintiff's "conclusory assertions ..., in the absence of

[admissible] supporting evidence, are insufficient to withstand summary judgment."); *Harris v. Ostrout*, 65 F.3d 912, 916 (11th Cir. 1995) (grant of summary judgment appropriate where inmate produces nothing beyond "his own conclusory allegations" challenging actions of the defendants); *Fullman v. Graddick*, 739 F.2d 553, 557 (11th Cir. 1984) ("Mere verification of party's own conclusory allegations is not sufficient to oppose summary judgment."); *Evers v. General Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("[C]onclusory allegations without specific supporting facts have no probative value."). Hence, when a plaintiff fails to set forth specific facts supported by requisite evidence sufficient to establish the existence of an element essential to his case and on which the plaintiff will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party.  *Celotex*, 477 U.S. at 322 ("[F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."); *Barnes v. Southwest Forest Industries, Inc.*, 814 F.2d 607, 609 (11th Cir. 1987) (If on any part of the prima facie case the plaintiff presents insufficient evidence to require submission of the case to the trier of fact, granting of summary judgment is appropriate.); *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (summary judgment appropriate where no genuine dispute of material fact exists).  At the summary judgment stage, this court must "consider all evidence in the record ... [including] pleadings, depositions, interrogatories, affidavits, etc. -- and can only grant summary judgment if everything in the record demonstrates that no genuine [dispute] of material fact exists."  *Strickland v. Norfolk Southern Railway Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012).

For summary judgment purposes, only disputes involving material facts are relevant. *United States v. One Piece of Real Property Located at 5800 SW 74thAvenue, Miami, Florida*, 363 F.3d 1099, 1101 (11th Cir. 2004). What is material is determined by the substantive law applicable to the case. *Anderson*, 477 U.S. at 248; *Lofton v. Secretary of the Department of Children and Family Services*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment."). "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (citation omitted). To demonstrate a genuine dispute of material fact, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In cases where the evidence before the court which is admissible on its face or which can be reduced to admissible form indicates there is no genuine dispute of material fact and the party moving for summary judgment is entitled to it as a matter of law, summary judgment is proper. *Celotex*, 477 U.S. at 323-324 (summary judgment appropriate where pleadings, evidentiary materials and affidavits before the court show no genuine dispute as to a requisite material fact); *Waddell v. Valley Forge Dental Associates, Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001) (To establish a genuine dispute of material fact, the nonmoving party

must produce evidence such that a reasonable trier of fact could return a verdict in his favor.).

Although factual inferences must be viewed in a light most favorable to the nonmoving party and pro se complaints are entitled to liberal interpretation, a pro se litigant does not escape the burden of establishing by sufficient evidence a genuine dispute of material fact. *Beard v. Banks*, 548 U.S. 521, 525, 126 S.Ct. 2572, 2576 (2006); *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990). Thus, the plaintiff's pro se status alone does not mandate this court's disregard of elementary principles of production and proof in a civil case.

The court has undertaken a thorough and exhaustive review of all the evidence contained in the record. After such review, the court finds that Foster has failed to demonstrate a genuine dispute of material fact in order to preclude entry of summary judgment in favor of the defendants.

## III.  ABSOLUTE IMMUNITY

To the extent Foster lodges claims against the defendants in their official capacities, they are entitled to absolute immunity from monetary damages. Official capacity lawsuits are "in all respects other than name, ... treated as a suit against the entity." *Kentucky v. Graham*, 473 U. S. 159, 166 (1985). "A state official may not be sued in his official capacity unless the state has waived its Eleventh Amendment immunity, *see Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 100, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984), or Congress has abrogated the state's immunity, *see Seminole Tribe v. Florida*,

[517 U.S. 44, 59], 116 S.Ct. 1114, 1125, 134 L.Ed.2d 252 (1996). Alabama has not waived its Eleventh Amendment immunity, *see Carr v. City of Florence*, 916 F.2d 1521, 1525 (11th Cir. 1990) (citations omitted), and Congress has not abrogated Alabama's immunity. Therefore, Alabama state officials are immune from claims brought against them in their official capacities." *Lancaster v. Monroe County*, 116 F.3d 1419, 1429 (11th Cir. 1997).

In light of the foregoing and under the facts of this case, the defendants are entitled to sovereign immunity under the Eleventh Amendment for claims seeking monetary damages from them in their official capacities. *Lancaster*, 116 F.3d at 1429; *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1277 (11th Cir. 1998) (state officials sued in their official capacities are protected from suit for damages under the Eleventh Amendment); *Edwards v. Wallace Community College*, 49 F.3d 1517, 1524 (11th Cir. 1995) (damages are unavailable from state official sued in his official capacity).

## IV.  DISCUSSION

### A. Eighth Amendment

Foster complains that the defendants failed to protect him from exposure to harmful levels of ETS. "The Eighth Amendment governs 'the treatment a prisoner receives in prison and the conditions under which he is confined.' *Helling v. McKinney*, 509 U.S. 25, 31, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993)." *Kelley v. Hicks*, 400 F.3d 1282, 1284 (11th Cir. 2005 (per curiam). Correctional officials may be held liable under the Constitution for acting with "deliberate indifference" to an inmate's health or safety when the official knows that the inmate faces "a substantial risk of serious harm" and with such knowledge

disregards that risk by failing to take reasonable measures to abate it. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). A constitutional violation occurs only when a plaintiff establishes the existence of "a substantial risk of serious harm, of which the official is subjectively aware, ... and [that] the official does not respond[] reasonably to the risk'...." *Marsh v. Butler County*, 268 F.3d 1014, 1028 (11th Cir. 2001) (en banc), quoting *Farmer*, 511 U.S. at 844. Thus, in order to survive summary judgment on this claim, Foster is "required to produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation. *LaMarca v. Turner*, 995 F.2d 1526, 1535 (11th Cir. 1993), cert. denied, 510 U.S. 1164, 114 S.Ct. 1189, 127 L.Ed.2d 539 1994)." *Hale v. Tallapoosa County*, 50 F.3d 1579, 1582 (11th Cir. 1995).

> To be deliberately indifferent, Defendants must have been "subjectively aware of the substantial risk of serious harm in order to have had a '"sufficiently culpable state of mind."'" *Farmer*, 511 U.S. at 834-38, 114 S.Ct. at 1977-80; *Wilson v. Seiter*, 501 U.S. 294, 299, 111 S.Ct. 2321, 2324-25, 115 L.Ed.2d 271 (1991).... [T]he prison official must be aware of specific facts from which an inference could be drawn that a substantial risk of serious harm exists--and the prison official must also "draw that inference." *Farmer*, 511 U.S. at 837, 114 S.Ct. at 1979.

*Roberts v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2003); *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004) (To establish that a prison official acted with deliberate indifference, "the prisoner must prove three facts: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) by conduct that is more than mere negligence.").

> [A] prisoner can state a cause of action under the Eighth Amendment for exposure to ETS by "alleging that [prison officials] have, with deliberate

indifference, exposed him to levels of ETS that pose an unreasonable risk of serious damage to his future health." *Helling*, 509 U.S. at 35, 113 S.Ct. 2475. As for the objective factor, the prisoner must show that he himself is being exposed to unreasonably high levels of ETS. *Id*. Relevant facts will include whether the prisoner remains housed in the environment and whether the facility has enacted a formal smoking policy. *Id*. at 35-36, 113 S.Ct. 2475. The objective factor further considers "a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to ETS ... [and] also requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Id*. at 36, 113 S.Ct. 2475 (emphasis in original). As for the subjective factor, the prisoner must show that prison authorities demonstrated a "deliberate indifference" to his plight. *Id*. The adoption of a smoking policy "will bear heavily on the inquiry into deliberate indifference." *Id*.

*Kelley*, 400 F.3d at 1284.

The adoption of a smoking policy is relevant to both elements of an ETS claim. *See Kelley*, 400 F.3d at 1284. Moreover, a prisoner who shows nothing more than negligent enforcement of such a policy falls short of establishing an Eighth Amendment violation. *Id* at 1285. However, "the mere existence of such a policy will not, by itself, satisfy the requirements of the Eighth Amendment; there must be a good faith effort to enforce the policy and the absence of such an effort may result in a finding of deliberate indifference." *Bartlett v. Pearson*, 406 F.Supp.2d 626, 632 (E.D.Va.2005); *see also Talal v. White*, 403 F.3d 423, 428 (6th Cir.2005) ("[T]he mere existence of non-smoking pods does not insulate a penal institution from Eighth Amendment liability....").

*Winkels v. Morales*, 2012 WL 3598851, at *5 (S.D. Ga. July 25, 2012), Report and

Recommendation adopted, 2012 WL 3597659 (S.D. Ga. Aug. 20, 2012).

In this case, Foster alleges he suffered damage to his respiratory system and

obstructive sleep apnea[3] during his incarceration at Bullock as a result of his exposure to

---

[3] On April 1, 2010, prison medical personnel referred Foster, a 55-year-old male weighing 235 pounds diagnosed as obese with hypertension and high cholesterol, to a free-world facility for a sleep study regarding his "chronic

ETS.  Foster further alleges that these health issues are directly related to his exposure to

excessive levels of ETS at Bullock and that such occurred due to the defendants' willful

failure to enforce the no smoking policy adopted by the Alabama Department of

Corrections ("AODC).  *Compl. - Doc. No. 1* at 3.[4]  In support of this claim, Foster contends

that the defendants failed to advise inmates of the no smoking policy, refused to punish

inmates for violation of the policy and did not provide proper ventilation in the dorms.  *Id.*s

It is undisputed that the Alabama Department of Corrections adopted a smoke free

policy in December of 2004 applicable to the Bullock Correctional Facility.  *Defendants'*

*Exh. 1 to the Second Supplemental Special Report (Admin. Reg. No. 009) - Doc. No. 37-1*

at 11-13.  This policy strictly prohibited the "use of tobacco products that produce smoke

... [i]nside all ADOC buildings and institutions."  *Id.* at 11.  The smoking prohibition

---

symptoms of OSA, with frequent apnea spells, with daytime somnolence." *Defendants' Exh. 3 to Third Supplemental Special Report - Doc. No. 43-3* at 6.  After conducting a sleep study at the Jackson Sleep Disorders Center in May of 2010, the attending physician determined that Foster suffered from Obstructive Sleep Apnea, a condition which commonly occurs in older, overweight or obese males with large tonsils, a thick neck, too much tissue at the back of the neck, a larger than average tongue and/or smaller airways in the nose, throat or mouth.  As reflected in the sleep study performed on Foster, OSA occurs when breathing slows or briefly stops because of a physical obstruction to the person's airway during sleep.  The medical records do not identify a cause for Foster's OSA nor does the free world physician make any mention of ETS in her notes.  These records do, however, indicate that Foster was consistently overweight with a body mass index in the obese range, *Id.* at 8, 21-23, 26-29 & 31-38, suffered from chronic hypertension and hyperlipidemia, *Id.* at 18-41, and had a larger than average neck circumference of 17 inches, *Id.* at 8, all of which placed him at high risk for OSA.  The study also demonstrated that Foster's average oxygen saturation level while awake was approximately ninety-five percent and hovered in the eighty-plus percentile range while sleeping, both of levels indicating normal breathing, lung function and circulation patterns.  *Id.* at 10.  The medical records likewise contain no complaint by Foster to prison health care personnel regarding exposure to ETS.  Based on the results of the sleep study, Foster was prescribed a CPAP machine which he received from prison medical personnel within a few weeks of the study's completion and used during the remainder of his confinement at Bullock.  Finally, due to complaints of chest congestion, an x-ray of Foster's chest was undertaken on September 12, 2012 and showed "clear lungs" and "no pleural effusion, pneumothorax, infiltrate, or congestion....  No acute cardiopulmonary disease seen."  *Id.* at 75.

[4] Foster bases these allegations on purely subjective beliefs.

included all inside rooms, elevators and ADOC vehicles.  *Id*. at 12.  The policy permitted smoking outside at "designated smoking areas ... not ... closer than ten (10) feet from the entrance of the building/institution."  "The designated smoking area for [general population] inmates [at Bullock is] on the inmate exercise yard."  *Standard Operating Procedure for Bullock - Doc. No. 37-1* at 9.  Because correctional officials did not designate Bullock as a tobacco-free facility, i.e., no tobacco products permitted anywhere on the premises, but merely a smoke-free facility, inmates could purchase tobacco products from the prison canteen for use in authorized smoking areas.

> In his initial affidavit, defendant Jones addresses Foster's claims as follows:

> Inmates at Bullock Correctional Facility are allowed to smoke only when outside of buildings.  No inmate is authorized to smoke inside of a building.  This policy is in effect in all Alabama Department of Corrections Facilities.  Inmates found smoking inside of buildings are issued either a Behavior Citation or Disciplinary for violation of Rule #316 of Annex C to Administrative Regulation #403 smoking or use of tobacco products in an unauthorized area.  (… A copy [of this regulation] is available to inmates at Bullock in the Law Library).
> As is typical in correctional settings, many inmates violate the rules.  Disciplinary action is taken on inmates caught smoking inside the buildings at Bullock.  Tobacco products are sold to inmates at the Canteen at Bullock because Bullock is not a designated tobacco free facility....  Inmate Foster has never complained to me about inmates smoking in his dormitory.

*Defendants' Exh. 3 to the Special Report - Doc. No. 19-4* at 1-2.  Defendant Giles maintains that:

> While tobacco products are sold at the Inmate Canteen, inmates are not allowed to smoke inside of the dormitory.  Bullock is a smoke free facility, not a tobacco free facility.  Therefore inmates desiring to smoke are allowed to do so only on the institution's recreation yard and the designated smoke yards.  However inmates do violate the policy; those inmates that are

caught are given a Behavior Citation or a disciplinary for violation of Rule #316, Smoking or use of tobacco products in an unauthorized area.

Inmate [F]oster has not complained to me concerning any inmates smoking in the dormitory nor has anything been brought to my attention about any health issues that inmate Foster was having or any that has been exacerbated by his being subjected to cigarette smoke.

*Defendants' Exh. 4 to the Special Report - Doc. No. 19-5* at 1-2.

In a subsequent affidavit, defendant Jones further addresses the claims presented by

Foster as follows:

Inmates found smoking inside of buildings are issued either a Behavior Citation or Disciplinary for violation of Rule #316 of Annex C to Administrative Regulation #403 smoking or use of tobacco products in an unauthorized area.

I have reviewed the affidavit by our maintenance supervisor who has worked at Bullock for 29 years [in which he addresses the ventilation at Bullock].   His testimony comports with my memory (although he would know better than me since that is more his "field.")   The exhaust fans were continually operable in the dorms except … maybe briefly when repairs were necessary, and then those repairs did not take long.   I also know that there were (and are) large floor fans in all the dorms that move air.   I have also seen the doors slam[] with the suction generated by the air movement. Additionally, I also know windows can be raised.

With respect to smoking areas, inmates were allowed to smoke on the general population yard outside the dorms.   Each specialized unit (i.e., the mental health unit) also had a smoking area outside the unit.   Inmates knew this and utilized the outdoor area[s] to smoke.   I have seen inmates using these smoking areas thousands of time.

To the best of my knowledge, inmates were not allowed to smoke inside dorms and if they were caught doing so, they were disciplined for it. I know many inmates were written up and disciplined for this kind of violation.   Correctional staff knew the no-smoking-inside-the-dorms policy and knew management expected the policy to be enforced.  If it came to the attention of the wardens or captains that correctional staff was not enforcing the policy, those staff members would have been disciplined.

I do not recall inmate Eddie Lee Foster (AIS 143404) asking to be placed in a no-smoking area, but wherever he resided was <u>already</u> a non-smoking area because the entire prison (inside buildings) is a non-smoking

area.  There would have been no dorm to transfer Foster into for non-smoking different from (or better than) where he was assigned already.

It was universally and commonly known by staff and inmates that no smoking was allowed in the prison buildings.  Orientation materials [provided to inmates upon entry into Bullock] emphasized this as well as Admin Regulations and SOPs available to inmates in the law library.  Of course security staff emphasized the policy verbally and would have disciplined an inmate who violated the policy, as explained above.

The facts and policies I have described above [were] true in 2013 and before that when Foster was assigned to Bullock (as it was true until the time I retired a few weeks ago....).

*Defendants' Exh. 1 to the Third Special Report - Doc. No. 43-1* at 1-2; *Defendants' Exh. 2 to the Third Special Report - Doc. No. 43-2* at 1-2 (same).  The maintenance supervisor, who has worked at Bullock for twenty-nine years stated, in pertinent part, that "[t]he exhaust fans in the dorms at Bullock are operable now and would have been operable in 2013 and as long as I can remember before that.  [The maintenance crew members] maintain them, as needed….   If the exhausts become inoperable for any reason, [the maintenance] crew makes immediate repair of the exhaust fans a priority….   There is no dorm or area of the dorms that would have been without exhaust fans for any significant length of time - just long enough to make the repair….   [T]here are large floor fans that move air in all the dorms.  I know that the exhaust fans and the floor fans actually move the air.  I am often personally in those dorms supervising my crew or working on maintenance issues.  I can feel the air movement and I also can see the effect of the fans because the suction effect of the fans causes doors in the prison facility to swing closed. The windows in the dorms can also have been raised to help move air if necessary.  What

I have described above would have been just as true in 2013 and before as it is currently."
*Defendants' Exh. 4 to the Third Special Report - Doc. No. 43-4 at 1-2.*

Regarding the objective component of the deliberate indifference standard, Foster has come forward with little more than his own averment and that of another inmate that inmates smoked in the dorms at Bullock, *Doc. No. 21-1* and *Doc. No. 21-3*, and the affidavit of inmate Craig Brooks, *Doc. No. 21-2*, that he occasionally smoked in the dorm in which Foster was housed. These general assertions provide no indication as to the levels or frequency of Foster's exposure to ETS since June of 2014. *See Kelley*, 400 F.3d at 1285 (finding plaintiff did not satisfy the objective prong by alleging that "other inmates in his pod smoked inside the facility and that the ventilation was insufficient.").

Foster's medical condition is also relevant to this court's analysis of the objective element. As noted, Foster suffers from Obstructive Sleep Apnea. The medical records, however, are devoid of evidence which would be admissible at trial to show a causal connection between this condition and Foster's exposure to ETS.[5] Instead, these records demonstrate that Foster suffered several risk factors for Obstructive Sleep Apnea wholly unrelated to ETS including obesity, physical inactivity and a large neck. In addition, the medical records show that during Foster's confinement at Bullock his lungs were clear and his cardiopulmonary activity was normal.

---

[5] Although Foster in his affidavit alleges a free-world physician stated "something … disturbed your respiratory organs" and exposure to cigarette smoke "could have" caused the damage, *Doc. No. 21-1* at 1, these purported statements are purely hearsay and, as such, cannot be utilized to defeat summary judgment.

The no smoking policy in effect at Bullock during the period of time relevant to the instant complaint also plays a part in the determination of whether Foster can satisfy the objective prong of his ETS claim. The evidence uniformly shows that rules and regulations adopted by the ADOC in 2004 prohibit smoking in any building within its prison facilities, including the dormitories at Bullock. Foster makes the self-serving, conclusory allegation that the defendants failed to enforce the rules prohibiting smoking in the dorms. The defendants adamantly deny this assertion and maintain that violators of the no smoking policy routinely received behavior citations and/or disciplinaries for smoking in unauthorized areas. The evidence presented by Foster does not refute the fact that prison officials, including the defendants, enforced the indoor smoking ban at Bullock; rather, this evidence merely suggests that the policy did not eliminate ETS from the prison as inmates chose to violate the institutional rule prohibiting smoking in the dorms. One such inmate. Craig Brooks, provided an affidavit for use by Foster in this case. Interestingly, despite knowledge that inmate Brooks routinely smoked in the dorms, Foster did not report these violations to prison officials so that disciplinary action could be taken against inmate Brooks. Moreover, the adoption of a no smoking policy "bear[s] heavily on the inquiry into deliberate indifference," *Helling*, 509 U.S. at 36, 113 S.Ct. at 2475, and "militates against a finding of deliberate indifference" when correctional officials undertake good faith efforts to enforce the policy. *Scott v. District of Columbia*, 139 F.3d 940, 944 (D.C. Cir. 1998).

The evidence presented by Foster is insufficient to establish the objective prong of his deliberate indifference claim.  Although the no smoking policy does not totally negate the possibility that Foster was exposed to ETS, the court finds that the fact that a no smoking policy existed and correctional officials enforced this policy to the best of their abilities reduces the likelihood that Foster was exposed to unreasonably high levels of ETS. *See Kelley*, 400 F.3d at 1284 (finding plaintiff failed to establish the objective prong, in part, because "the facility had a no-smoking policy in place and that any inmate caught smoking inside would be disciplined.").  The evidence presented by Foster that the policy did not completely eradicate indoor smoking does not alter this finding.

Even if Foster could satisfy the objective component of his deliberate indifference claim, this claim nevertheless fails on the subjective prong.  Other than a letter Foster addressed to the defendants in October of 2012 complaining of his exposure to ETS in Dorm K-3 and seeking issuance of an order that smoking in the "dorm area be halted[,]" *Doc. No. 21-4*, there is no evidence that the defendants were personally aware that Foster was exposed to unreasonably high levels of ETS while at Bullock or that his exposure to ETS caused or exacerbated a health issue.  Specifically, the letter does not indicate that it was received by either defendant and the defendants deny any knowledge of the information contained in the letter or other information that Foster was at substantial risk of harm from excessive levels of ETS.  Additionally, an exhaustive review of the medical records submitted in this case reveals that Foster made no mention of exposure to ETS in his requests for treatment from health care personnel.  Finally, Foster does not allege nor

17

is there anything in the record to indicate that he reported any inmate for violating the no smoking policy, despite his protestations that inmates were always smoking inside the facility. The aforementioned actions undermine Foster's assertion that he was continually exposed to unreasonably high levels of ETS.

As previously referenced, the adoption of a no smoking policy "bear[s] heavily on the inquiry into deliberate indifference." *Helling*, 509 U.S. at 36. In this case, the defendants have shown that in 2004 the ADOC adopted a policy which prohibited smoking in all correctional facilities. As explained above, the defendants have shown that prison officials enforced this policy at Bullock by issuing behavior citations or disciplinaries to inmates caught smoking in unauthorized areas, including the dorms. At most, the evidence submitted by Foster shows imperfect enforcement of the no smoking policy, which under the facts of this case is insufficient to establish deliberate indifference. *See Kelley*, 400 F.3d at 1284 (finding plaintiff failed to show deliberate indifference because he had only shown that certain prison officials "were negligent in enforcing the nonsmoking policy"); *see also Scott*, 139 F.3d at 944 ("[I]t is hard to see how imperfect enforcement of a nonsmoking policy can, alone, satisfy *Helling*'s subjective element.").

Finally, the Court rejects Foster's contention that the defendants violated his Eighth Amendment rights by simply allowing inmates to purchase tobacco products from the prison canteen. The notion that correctional officials could be held liable for merely allowing inmates to purchase tobacco products is plainly at odds with the governing case

law, which requires a plaintiff to establish both the objective and subjective elements in order to prevail on an Eighth Amendment ETS claim.

The record is completely devoid of evidence that the defendants had knowledge of specific facts from which an inference could be drawn that a substantial risk of harm existed to Foster due to exposure to unreasonable high levels of ETS nor is there any evidence that the defendants actually drew this inference and thereafter ignored the attendant risk of harm. Consequently, Foster likewise fails to establish the requisite element of subjective awareness on the part of the defendants.

In light of the foregoing, the court concludes that summary judgment is due to be granted in favor of the defendants as Foster fails to satisfy each of the requisite elements of his Eighth Amendment claim.

### B.  State Law Claim

To the extent Foster asserts that the actions of the defendants violated state law, review of this claim is appropriate only upon utilization of this court's supplemental jurisdiction.[6]  In the posture of this case, however, the court finds that exercise of such jurisdiction is inappropriate.

For a federal court "[t]o exercise [supplemental] jurisdiction over state law claims not otherwise cognizable in federal court, 'the court must have jurisdiction over a substantial federal claim and the federal and state claims must derive from a "common

---

[6] Foster does not identify the state law allegedly violated by the defendants.

nucleus of operative fact.""" *L.A. Draper and Son v. Wheelabrator Frye, Inc.*, 735 F.2d 414, 427 (11th Cir. 1984).   The exercise of supplemental jurisdiction is completely discretionary.  *United Mine Workers v. Gibbs*, 383 U.S. 715 (1966).  "If the federal claims are dismissed prior to trial, *Gibbs* strongly encourages or even requires dismissal of the state claims." *L.A. Draper and Son*, 735 F.2d at 428.   In view of this court's resolution of the federal claims presented in the complaint, Foster's pendent state claim is due to be dismissed without prejudice.  *Gibbs*, 383 U.S. at 726 (if the federal claims are dismissed prior to trial, the state claims should be dismissed as well); *see also Ray v. Tennessee Valley Authority*, 677 F.2d 818 (11th Cir. 1982).

## V.  CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1.  The defendants' motion for summary judgment be granted.

2.  Judgment be entered in favor of the defendants.

3.  The pendant state claim be dismissed without prejudice.

4.  The plaintiff's federal constitutional claims be DISMISSED with prejudice.

5.  The costs of this proceeding be taxed against the plaintiff.

It is further

ORDERED that **on or before August 24, 2016,** the parties may file objections to this Recommendation.   Any objections filed must clearly identify the findings in the Magistrate Judge's Recommendation to which the party is objecting.   Frivolous, conclusive or general objections will not be considered by the District Court.   The parties are advised

20

that this Recommendation is not a final order of the court and, therefore, it is not appealable. Failure to file written objections to the Magistrate Judge's findings and recommendations in accordance with the provisions of 28 U.S.C. § 636(b)(1) shall bar a de novo determination by the District Court of legal and factual issues covered in the Recommendation and waives the right of the plaintiff to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); 11th CIR. R. 3-1. *See Stein v. Lanning Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982). *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc).

Done this 10th day of August, 2016

/s/Charles S. Coody
_____

CHARLES S. COODY

UNITED STATES MAGISTRATE JUDGE